IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BOBBY G. HUDSON                          )
                                         )
v.                                       )        NO. 3:08-0687
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security          )


To: The Honorable John T. Nixon, Senior District Judge


**REPORT AND RECOMMENDATION**

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's decision to attribute the plaintiff's mental impairments to his alcohol abuse was not supported by substantial evidence as required by 42 U.S.C. § 405(g) and this case should be remanded for further action in accordance with the recommendations contained herein.


**I. INTRODUCTION**

The plaintiff filed applications for DIB and Supplemental Security Income ("SSI") on August 5, 2004,[1] alleging disability due to "[b]rain disorders" and arterial venous malformation ("AVM")[2]

---

[1] Both parties referred to the plaintiff's having filed his application on July 28, 2004. *See* tr. 15, Docket Entry No. 16, at 1, Docket Entry No. 17, at 1. The "Leads/Protective Filing

-1-

with an onset date of September 12, 2003. (Tr. 59-61, 102.) His applications were denied initially and upon reconsideration. (Tr. 39-42, 45-47.) On January 27, 2007, the plaintiff was diagnosed with symptoms of stage IV laryngeal/supraglottic squamous cell carcinoma and amended his claim to reflect this diagnosis. (Tr. 15, 161.) A hearing was held before Administrative Law Judge ("ALJ") Robert Haynes on October 1, 2007. (Tr. 372-95.) The ALJ delivered a partially favorable decision on November 5, 2007, finding that the plaintiff was disabled as of January 27, 2007, entitling him to SSI benefits as of January 27, 2007, but finding that he was not entitled to DIB benefits since his insured status expired on June 30, 2005. (Tr. 10-20.) On November 30, 2007, the plaintiff petitioned the Appeals Council for a review of that decision. (Tr. 9.) The Appeals Council denied the

---

Worksheet" indicates that the "lead" was "established" on July 28, 2004 (tr. 64), but the application itself appears to have been filed on August 5, 2004. *See* tr. 59-61.

[2] AVM is a circulatory defect comprised of snarled tangles of arteries and veins which lack the normal capillary connections. In the absence of capillaries, the normal route of oxygen delivery to the brain is compromised. In AVM,

> arteries dump blood directly into veins through a passageway called a fistula. The flow rate is uncontrolled and extremely rapid—too rapid to allow oxygen to be dispersed to surrounding tissues.
>
> * * *
>
> This abnormally rapid rate of blood flow frequently causes blood pressure inside the vessels located in the central portion of an AVM directly adjacent to the fistula—an area doctors refer to as the nidus, from the Latin word for nest—to rise to dangerously high levels. The arteries feeding blood into the AVM often become swollen and distorted; the veins that drain blood away from it often become abnormally constricted (a condition called stenosis). Moreover, the walls of the involved arteries and veins are often abnormally thin and weak. Aneurysms—balloon-like bulges in blood vessel walls that are susceptible to rupture—may develop in association with approximately half of all neurological AVMs due to this structural weakness.

National Institute of Neurological Disorders and Stroke, Arteriovenous Malformations and Other Vascular Lesions of the Central Nervous System Fact Sheet, NIH Pub. No. 04-4854 (Aug. 13, 2010), *available at* http://www.ninds.nih.gov/disorders/avms/detail_avms.htm.

Case 3:08-cv-00687   Document 19   Filed 10/06/10   Page 2 of 31 PageID #: 72

plaintiff's request for review on May 20, 2008, and the ALJ's decision became the final decision of the Commissioner. (Tr. 3-6.)

## II. BACKGROUND

The plaintiff was born on December 25, 1953, and was 49 years old as of September 12, 2003, his alleged onset date. (Tr. 59.) The plaintiff completed the seventh grade and likely attended special education classes. (Tr. 244, 284, 378.) The plaintiff's past jobs include work as a warehouse laborer and floor layer. (Tr. 388.)

### A. Medical Records

On April 22, 2003, upon referral from Dr. Robert Gailmard, the plaintiff presented to Dr. Robert A. Willis, an otolaryngologist, with complaints of a sore throat. (Tr. 223, 368-69.) Dr. Willis noted the plaintiff had a history of facial plastic surgery from 1999 to 2000, hernia problems, and bone cysts, and that the plaintiff reported that he smoked two packs of cigarettes and consumed an average of six alcoholic beverages a day. (Tr. 369.) Following the consultation, Dr. Willis wrote to Dr. Gailmard that the plaintiff had adenopathy[3] and evidence of gastroesophogeal reflux disease ("GERD") and that he needed to quit smoking and drinking to reduce his future risk of developing cancer. (Tr. 368.) Dr. Willis recommended that the plaintiff undergo aggressive treatment with antibiotics and reflux medications. *Id.* Between May and August of 2003, Dr. Willis effectively treated the plaintiff several times for tonsil pain and GERD, repeatedly encouraged him

---

[3] Adenopathy is an enlargement of the glands, especially of the lymphatic glands. Dorland's Illustrated Medical Dictionary 30 (30th ed. 2003) ("Dorland's").

-3-

to quit smoking and drinking, suggested that he attend an alcohol rehabilitation program (tr. 359-67), diagnosed him with a deviated septum (tr. 359), recommended that he undergo an examination of his pharynx, a laryngoscopy, and a biopsy of "suspicious areas" (Tr. 359), and prescribed Nexium[4] (tr. 367), Wellbutrin[5] (tr. 365), Nicotrol inhalers[6] (tr. 363), Levaquin, Omnicef,[7] Cleocin,[8] Augmentin (tr. 359),[9] and Xanax.[10] (Tr. 363.)

On August 14, 2003, a CT scan of the plaintiff's neck did not show any abnormalities but revealed an "[e]nhancing vascular structure in the periphery of the brain." (Tr. 346.) One week later, an MRI of the plaintiff's brain demonstrated no hemorrhaging but showed "[v]ascular malformation, probably representing arterial venous malformation [AVM of the] left temporoparietal lobe." (Tr. 345.) On August 29, 2003, a CT scan of the plaintiff's paranasal sinuses revealed sinusitis, nasal septal deviation, and a small cyst or polyp on the wall of his sinuses. (Tr. 342.)

On September 10, 2003, the plaintiff presented to Dr. Ronald T. Zellem, a neurosurgeon, upon referral from Dr. Willis, and reported that he smoked one to two packs of cigarettes a day, drank alcohol everyday, and had "an occasional 'dripping sensation' in his left ear." (Tr. 326-27.)

---

[4] Nexium is used to treat GERD. Physicians' Desk Reference 704-05 (64th ed. 2010) ("PDR").

[5] Wellbutrin is prescribed for major depressive disorder. PDR at 1720.

[6] Nicotrol, dispensed by an oral inhaler, is a smoking cessation aid used to relieve symptoms of nicotine withdrawal. Saunders Pharmaceutical Word Book 491 (2009) ("Saunders").

[7] Levaquin and Omnicef are used to treat infections caused by bacteria, including acute bacterial sinusitis. PDR at 520, 2629.

[8] Cleocin is an antibiotic. Saunders at 167.

[9] Augmentin is oral antibacterial medication. PDR at 1331.

[10] Xanax is used to treatment panic disorders and agoraphobia. PDR at 768.

-4-

Dr. Zellem reviewed the plaintiff's August 21, 2003, cranial MRI and diagnosed him with an incidental left temporoparietal occipital AVM and "no evidence of previous hemorrhage." (Tr. 327.) On September 12, 2003, Dr. Willis performed nasal sinus surgery on the plaintiff and noted that he had some cerebrospinal fluid ("CSF") drainage during the procedure. (Tr. 294-96, 328-30.) While in the hospital recovering from surgery the plaintiff had a normal diet and no bleeding or CSF leakage, demonstrated no problems with alcohol withdrawal or nicotine cravings, and was discharged in stable condition. (Tr. 293, 322.) Post-surgery, Dr. Willis examined the plaintiff on several occasions in September and October of 2003 and noted that the plaintiff had occasional headaches (tr. 357) but was healing well and had no further CSF drainage. (Tr. 311, 324, 355, 357.)

In an October 10, 2003, letter to Dr. Zellem, Dr. George S. Allen, a neurosurgeon at Vanderbilt University Medical Center ("VUMC"), wrote that he examined the plaintiff and discussed therapeutic options with him for his AVM, including embolization treatment,[11] and scheduled an angiogram.[12] (Tr. 311.) On November 7, 2003, Dr. Theodore Larson of the Vanderbilt University Interventional Neuroradiology Clinic examined the plaintiff and found that he had "no neurological deficit, visual complaints, memory loss or speech difficulties related to his [AVM]," or complaints of headaches but some left temporal pain. (Tr. 318.) The plaintiff reported to Dr. Larson that he smoked two pack of cigarettes a day, drank three cans to one case of beer a day, and

---

[11] Embolization treatment of an AVM involves the deliberate obstruction of a blood vessel designed to cut off blood flow to the AVM by filling it with specially designed particles. This makes the AVM "more manageable during subsequent procedures by decreasing the amount of bleeding during surgery or by reducing the size of the nidus and thereby creating a smaller target for radiosurgery." International RadioSurgery Association, *AVM*, http://www.irsa.org/avms.html.

[12] An angiogram is a radiograph of blood vessels. Dorland's at 83.

was taking Nexium. *Id.* Dr. Larson diagnosed the plaintiff with AVM and recommended that he undergo embolization. (Tr. 319.)

In a November 7, 2003, letter to Dr. Zellem, Dr. Allen noted that he had reviewed the plaintiff's angiogram, diagnosed him with a 3cm left posterior Sylvian AVM, and recommended that the plaintiff undergo embolization and have an MRI of the affected area. (Tr. 310, 317.) Additionally, in November and December of 2003, the plaintiff returned to Dr. Willis for two follow-up examinations and he opined that the plaintiff was "doing well" and "healing well." (Tr. 350, 352.)

On January 6, 2004, Dr. Hong Yu, a surgeon at Vanderbilt Hospital, performed an embolization of the plaintiff's left middle cerebral artery to reduce the effects of his AVM. (Tr. 309.) The plaintiff "tolerated the procedure well without acute complications" and he was discharged on January 7, 2004, with instructions to continue pre-operation medications and avoid heavy lifting. *Id.* On January 26, 2004, Dr. Anthony Cmelak, a radiation oncologist, evaluated the plaintiff at VUMC to determine the efficacy of radiation treatment on his remaining AVM. (Tr. 303.) An MRI of the plaintiff's brain revealed a left parietotemporal AVM (tr. 118), and Dr. Cmelak noted that although the plaintiff was recovering well from his embolization (tr. 303), he still had an increased risk for a stroke without further treatment for his AVM. (Tr. 305.) Dr. Cmelak recommended that the plaintiff undergo radiosurgery since it has a success rate of "about 95%." *Id.* The plaintiff also reported to Dr. Cmelak that he smoked two packs of cigarettes and drank six beers a day. (Tr. 304.)

In a January 26, 2004, letter to Dr. Zellem, Dr. Allen reported that the plaintiff's embolization had reduced the size of his AVM by "about 45%" and the flow of his AVM by "about 50%." (Tr. 307.) Dr. Allen opined that the plaintiff faced less of a risk from radiosurgery than from

a crainiotomy and surgical removal, but still faced a five percent risk of temporary or permanent speech and vision difficulty or paralysis from the radiosurgery, which could occur within a few days of the procedure or up to four to five years later. (Tr. 307, 314.) Dr. Allen related that there was an 80-85% chance that the radiosurgery would "obliterate" the AVM within three years of the procedure and that the plaintiff approved of the radiosurgery plan. *Id.* The plaintiff returned to Dr. Willis on February 4, 2004, and he showed no evidence of CSF leakage but had "some congestion and drainage." (Tr. 348.)

On March 22, 2004, a CT scan of the plaintiff's head showed an AVM "in the posterior left frontal/parietal region of the brain" (tr. 116), and an MRI of his head demonstrated "no gross changes" from his January 26, 2004 MRI. (Tr. 117.) On the same day, Dr. Allen performed a radiosurgical procedure on the plaintiff's left posterior AVM and noted that the procedure was "significantly more complex than the standard case" since there were numerous blood vessels in that region of the brain. (Tr. 300-01.) The plaintiff was discharged in stable condition. (Tr. 302.)

On May 25, 2006, the plaintiff was taken to the Sumner Regional Medical Center Emergency Room after being involved in a car accident. (Tr. 193-96.) The plaintiff complained of shoulder, arm, and back pain, was treated for a left rib fracture and other minor injuries, and reported that he was a heavy smoker and drinker of alcohol. (Tr. 193-96, 207-216.) Over the next four months, Dr. Michael J. Tigges, a chiropractor at Tigges Chiropractic, treated the plaintiff for neck and back pain which included physical therapy and electrical nerve stimulation. (Tr. 167-73.) On August 16, 2006, the plaintiff reported that he had no complaints of neck or back pain, exhibited normal ranges of motion, and was released from Dr. Tigges' care. (Tr. 167.)

-7-

On January 27, 2007, the plaintiff presented to Dr. Willis with complaints of sore throat and discomfort and Dr. Willis opined that he demonstrated evidence of extensive cancer of the larynx and voice box, ordered a biopsy, and noted that the plaintiff continued to smoke heavily and drink "quite a bit of beer." (Tr. 160-61.)  In a February 13, 2007, letter to Dr. Dianna Shipley, an oncologist with Tennessee Oncology, Dr. Willis also described the plaintiff as a heavy smoker and drinker. (Tr. 156.)  On February 15, 2007, a biopsy of the plaintiff's throat showed that he had cancer in his left arytenoid, epiglottis, larynx, and right false vocal cord. (Tr. 143.)  On the same day, Dr. Shipley examined the plaintiff and noted, inter alia, that he had "poor sleeping, stress and anxiety." (Tr. 145-46.)  The plaintiff reported to Dr. Shipley that he smoked two packs of cigarettes a day and drank 12 beers a week. (Tr. 144.)  Since the ALJ found that the plaintiff was entitled to SSI benefits as a result of his stage IV cancer (tr. 19-20), the Court will not address the remainder of Dr. Shipley's treatment notes from February 22, 2007, to September 6, 2007. (Tr. 119-42.)

### B. Physical Evaluations

On November 8, 2004, Dr. Albert Gomez, a consultative DDS examiner, completed a physical examination of the plaintiff (tr. 288-290) and the plaintiff complained that since his AVM surgery he had not been able to function or concentrate, had decreased balance, and had ringing in both ears. (Tr. 288.)  The plaintiff also reported that he drank "6 to 12 beers a day" between 1980 and 2000 and that since 2000 he drinks "approximately 12 beers a day only on the weekends." *Id.* Dr. Gomez noted that the plaintiff had five out of five motor strength in both his upper and lower extremities and he diagnosed the plaintiff with AVM and alcohol abuse. (Tr. 289-90.)  Dr. Gomez

-8-

opined that in an eight hour workday the plaintiff "could occasionally lift 20 pounds" and "stand or sit at least six hours" with normal breaks. (Tr. 290.)

On February 16, 2005, Dr. Celia Gulbenk, a non-examining consultative physician, completed a physical residual functional capacity ("RFC") assessment (tr. 257-62) on the plaintiff and opined that he could occasionally lift/carry up to ten pounds and frequently carry less than ten pounds. (Tr. 258.) Dr. Gulbenk noted that in an eight hour workday, with normal breaks, the plaintiff could stand/walk at least two hours and sit for about 6 hours. *Id.* She also determined that the plaintiff had unlimited capacity to push and pull (*id.*), and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 262.)

### C. Psychological Evaluations

The plaintiff does not have a history of mental health treatment (tr. 284, Docket Entry No. 16, at 3), but he was evaluated by several Tennessee Disability Determination Section ("DDS") examiners. On December 9, 2004, Dr. Linda Blazina, a consultative DDS psychologist, conducted a clinical interview with and mental status examination of the plaintiff. (Tr. 282-87.) Dr. Blazina noted that the plaintiff presented with clean and adequate hygiene, "did not display any unusual mannerisms during the evaluation," was alert and cooperative, made minimal direct eye contact, and exhibited a depressed mood, flat affect, and slow speech, but had no "impairment in his reality testing." (Tr. 282-83.) The plaintiff complained of anxiety, depression, appetite and sleep disturbances, concentration and focus problems, and irritability. (Tr. 283.) He reported having passive suicidal thoughts and that he once attempted suicide by running his car into a tree but that he had no current suicidal or homicidal ideations. *Id.* The plaintiff also related that he had four prior

-9-

DUI arrests, had participated in "some type of substance abuse counseling," had undergone AVM surgery, usually drank six beers a day, had no history of mental health treatment, took no medication, could dress and bathe independently, and did not drive, shop, do household chores, or engage in leisurely activities. (Tr. 283-84.)

Dr. Blazina opined that the plaintiff was adequately oriented, displayed slow cognition and responses, had below average memory functions, could recall recent events but had trouble recalling specific dates in the past, did not report difficulty "getting along with others," utilized an adequate vocabulary, and had poor attention, concentration, and abstraction skills. (Tr. 283-85.) She "estimated" the plaintiff's intellectual functioning to be in the "low average ranges" (tr. 283), and recommended that a payee be appointed to the plaintiff if the plaintiff was awarded benefits. (Tr. 285.) Dr. Blazina diagnosed him with recurrent moderate major depressive disorder with no psychotic features, cognitive disorder Not Otherwise Specified ("NOS"),[13] alcohol abuse, and a history of AVM. (Tr. 286.) She assigned the plaintiff a Global Assessment of Functioning ("GAF")

---

[13] The NOS designation is used to identify disorders for which

[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the special disorders . . . , [t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV Classification but that causes clinically significant distress or impairment . . . , [t]here is uncertainty about etiology . . . , [or] [t]here is insufficient opportunity for complete data collection (e.g., in emergency situations) or inconsistent or contradictory information, but there is enough information to place it within a particular diagnostic class.

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 4 (4th ed. 2000) ("DSM-IV-TR").

-10-

score of 50 to 55[14] and concluded that he was mildly limited in his ability to socially interact due to depression; moderately limited in his ability to understand and remember, "to adapt to changes and requirements in a work setting, [and] to tolerate stress" due to depression and cognitive difficulties; and was severely limited in his ability to sustain concentration and persistence due to depression. *Id.*

On December 16, 2004, Dr. Hank Edwards, a DDS psychologist, completed a Psychiatric Review Technique Form ("PRTF"). (Tr. 263-72.) He listed the plaintiff's diagnoses as "R/O [rule-out] cognitive D/o [disorder] NOS" (tr. 264), depressive syndrome characterized by "[a]nhedonia or pervasive loss of interest in almost all activities, [s]leep disturbance, [d]ecreased energy, [f]eelings of guilt or worthlessness, and [d]ifficulty concentrating or thinking" (tr. 266), and substance addiction disorder evaluated under the listing for affective disorders. (Tr. 271.) Dr. Edwards determined that the plaintiff had moderate restrictions of activities of daily living, difficulty in maintaining social functioning, and difficulty in maintaining concentration, persistence, and pace, and no episodes of decompensation. (Tr. 273.)

Dr. Edwards opined that the plaintiff's alleged limitations were inconsistent with the plaintiff's diagnosis and treatment of AVM and noted that his continued abuse of alcohol was "a factor."[15] (Tr. 276.) Dr. Edwards found that although the plaintiff alleged having significant

[14] The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV-TR at 34. A GAF score within the range of 41-50 means that the plaintiff has "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." *Id.* A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.*

[15] Dr. Edwards' handwriting was very difficult to read.

-11-

problems with "concentration, mood, and irritability," his complaints were not "involved with his AVM treatment," and he did not have a "significantly invasive procedure." *Id.* He noted that the plaintiff's depression caused him to be "fearful of daily activities," that he gave "little credibility" to the assessment of the plaintiff's daily activities by his former girlfriend (tr. 93-100) because she repeated what the plaintiff told her and it was not supported by medical evidence, and that the less restrictive activities of daily living assessment completed by the plaintiff's sister (tr. 104-112) were "more consistent with the facts and with [the] actual impact of AVMs." (Tr. 276-77.) Additionally, although Dr. Edwards determined that the plaintiff exaggerated his symptoms at a previous mental evaluation, he concluded that the mental evaluation "[t]otally supports some cognitive impairment, either from long-term alcohol use or radiation, but short of listing level," that his credibility was suspect, that the medical evidence did not support a finding that he had a severe impairment, and that he was "not capable" secondary to continued alcohol abuse. (Tr. 277.) Without explanation, Dr. Edwards concluded his report by noting that "substance abuse is not material." *Id.*

On the same day, Dr. Edwards also completed a mental RFC assessment on the plaintiff (tr. 278-81) and determined that he was moderately limited in his ability to understand, remember, and carry out detailed instructions, "to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "to maintain concentration for extended periods," "to perform activities within a schedule, maintain regular attendance, and be punctual," "to work in coordination with or proximity to others without being distracted by them," "to accept instructions and respond appropriately to criticism from supervisors," "to get along with coworkers or peers," "to maintain appropriate social behavior," "to respond appropriately to changes in the work setting,"

-12-

and "to set realistic goals or make plans independently of others." (Tr. 278-79.) He also found that the plaintiff was markedly limited in his "ability to interact appropriately with the general public." (Tr. 279.)

On September 13, 2005, Dr. Blazina conducted a second clinical interview with and psychological evaluation of the plaintiff (tr. 242-49) and noted that he was thin and malnourished, disheveled in appearance, had poor hygiene, dirty and stained clothes, and able to offer only limited information about his past. (Tr. 242-43.) Dr. Blazina reported that the plaintiff was alert, "very guarded, and only marginally cooperative," laughed inappropriately at times and "frequently would clap his hands over his ears," made minimal direct eye contact, and displayed a dysphoric mood and blunted affect. (Tr. 243.)

Dr. Blazina administered the Wechsler Adult Intelligence Scale ("WAIS") and found that the plaintiff's verbal IQ score was 58, performance IQ score was 59, and full scale IQ score was 54. (Tr. 245.) She opined that the plaintiff's WAIS scores indicated that he was functioning at an extremely low intellectual level but that those scores "may underestimate his intellectual functioning" since he was irritable and distracted during the evaluation (*id.*), and suggested that based upon his "acknowledged history of alcohol abuse, if awarded benefits, a payee should be appointed for [his] funds." (Tr. 247.) Dr. Blazina diagnosed the plaintiff with depressive disorder, NOS; psychotic disorder, NOS; rule out alcohol dependence; rule out cognitive disorder, NOS; borderline intellectual functioning; and personality disorder, NOS, and assigned him a GAF score of 50. *Id.* Additionally, Dr. Blazina concluded that the plaintiff was moderately limited in his ability to understand and remember due to "cognitive problems," in his ability to interact socially, and in his ability "to adapt and respond to changes and requirements in a work setting," and moderately

-13-

to severely limited in his "ability to sustain concentration and persistence." (Tr. 248) She noted that the plaintiff would have difficulty interacting with the general public, "being aware of workplace hazards[,] and taking the appropriate precautions due to his attentional problems." *Id.*

The plaintiff also reported to Dr. Blazina that he completed the seventh grade, was in special education classes, quit his job at Fleetwood Homes after seventeen years "because they put too much on [him]," smoked daily, "had been jailed for 'drunk driving,'" and had no previous mental health or substance abuse treatment. (Tr. 244.) He stated that he could dress and bathe without assistance and had a driver's license but that he did not drive, shop, cook, or do housework, had only one friend and no close friendships or involvement with social activities, and was generally "very inactive." *Id.* The plaintiff related that he heard ringing and voices, was irritable, and had passive suicidal thoughts, a poor appetite, sleep disturbances, anxiety, sadness, a lack of interest in daily activities, and difficulty in completing tasks. (Tr. 243.) Dr. Blazina opined that the plaintiff's immediate memory functioning, new learning ability, and abstraction and concentration skills were poor, that he had below-average vocabulary, that his intellectual functioning was in the "extremely low range," but that his "current scores may underestimate his intellectual abilities to some extent due to marginal cooperation." (Tr. 243-44.)

On October 5, 2005, Dr. Brad Williams, a DDS non-examining consultative examiner, completed a PRTF on the plaintiff (tr. 224-37) and estimated that he was functioning intellectually at the borderline level. (Tr. 225.) Dr. Williams diagnosed the plaintiff with major depressive disorder and substance addiction disorder, and he evaluated each under the listings for organic mental and affective disorders. (Tr. 227, 232.) He determined that the plaintiff had moderate

-14-

restrictions of activities of daily living, difficulty in maintaining social functioning, and difficulty in maintaining concentration, persistence, and pace, and no episodes of decompensation. (Tr. 234.)

On the same day, Dr. Williams also completed a mental RFC on the plaintiff (tr. 238-40) and opined that he was moderately limited in his ability to understand, remember, and carry out detailed instructions, "to maintain attention and concentration for extended periods," "to perform activities within a schedule and maintain regular attendance and be punctual within customary tolerances," "to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "to interact appropriately with the general public," "to accept instructions and respond appropriately to criticism from supervisors," and "to respond appropriately to changes in the work setting." (Tr. 238-39.) Dr. Williams concluded that the plaintiff "[c]ould understand and carry out simple tasks while getting along with others" and "adapt[] at that level of functioning," but that his mood and intellect could limit his persistence, concentration, and pace and social interaction abilities "such that [the plaintiff] could not perform more complicated tasks nor deal [with the] public except [in] simple interactions." (Tr. 240.)

### D. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Gary Sturgill, a Vocational Expert ("VE"), testified. (Tr. 372-95.) The plaintiff testified that he completed the seventh grade and was "in the special reading classes" and that he worked nearly seventeen years at Fleetwood, a mobile home manufacturer. (Tr. 378-79.) He related that his job at Fleetwood required him to stand and walk all day and lift "heavy pieces of plywood, the three-

-15-

quarters deck, and about 90 pounds of sheet." *Id.* The plaintiff testified that he quit his job at Fleetwood because "they kept driving [him], kept adding, adding, and [he] just couldn't do it." (Tr. 379, 386.) He related that from 1998 to 2001, he was unemployed and lived off of his savings. (Tr. 379.) He testified that he also worked for The Gap, for "[o]ver a year or so," as a warehouse worker and forklift driver. (Tr. 379-80.) The plaintiff stated that he lives with his mother, does very little to help around the house, and does not leave his house often. (Tr. 386-87.)

The plaintiff testified that he was diagnosed with AVM and that he underwent an embolization in January of 2004 and radiosurgery in March of 2004. (Tr. 380.) The plaintiff testified "it will be several years before [his doctors] know if [his AVM] shrank" and that he had not received any further treatment since he does not have health insurance. (Tr. 380-81.) The plaintiff stated that his AVM caused him to have problems with his memory, interfered with his ability to work, and caused him to be fired from his job with The Gap. (Tr. 381, 385.) The plaintiff confirmed the accuracy of the third-party Activities of Daily Living assessment completed by his former girlfriend, Anna Lee, in which she stated that since the embolization and radiosurgery he had changed significantly, was incapable of performing normal daily activities, and suffered from memory loss, insomnia, loss of direction, and ringing in his ears. (Tr. 382.)

The plaintiff related that he had received at least four DUI's, spent time in jail and under house arrest for those DUI's, and had been to alcohol rehabilitation, but that he did not think he had an alcohol problem even though he admitted that "most people would think [he] had a problem." *Id.* He stated that his drinking did not interfere with his ability to work at Fleetwood and that he does not "drink very much now." (Tr. 382-83.)

-16-

The VE classified the plaintiff's previous jobs as a warehouse laborer as medium and unskilled and as a floor layer as medium and skilled. (Tr. 388.) The ALJ asked the VE to consider Dr. Gomez's physical evaluation and the work that the plaintiff would be able to perform, and the VE responded that he would be able to perform a full range of light work. (Tr. 389.) The ALJ next asked the VE to consider Dr. Gulbenk's physical RFC assessment and the work that the plaintiff would be able to perform, and the VE responded that he would be able to perform a "slightly reduced range of sedentary work." *Id.*

The ALJ also asked the VE to consider Dr. Blazina's 2004 and 2005 psychological evaluations of the plaintiff and the work that he would be able to perform, and the VE responded that both evaluations indicated that he would be precluded from performing any work. (Tr. 389-90.) The ALJ then asked the VE to consider whether there would be any sedentary work available for an individual who tested at the first grade level in reading, spelling, and he responded "[v]ery likely, no," but he also testified that light work might be available. (Tr. 390.) Next, the ALJ asked the VE to consider Dr. Edwards' mental RFC assessment of the plaintiff and the work that he would be able to perform, and the VE responded that he would be able to perform "only unskilled work, and certainly no work involving contact with the public." (Tr. 391.) The ALJ then asked the VE to consider Dr. Williams' mental RFC assessment of the plaintiff and the work that he would be able to perform, and the VE responded that he would be able to perform unskilled work. *Id.* The VE testified that an individual limited to unskilled light work and who had a diminished mental capacity could perform work as a housekeeper, dishwasher, and "grounds maintenance." (Tr. 392.)

The ALJ then asked the VE to consider what work an individual would be able to perform if he had "a memory problem" and difficulties with concentration, persistence, and pace that resulted

-17-

in a diminished capacity to follow instructions, sustain activity, and remain on task. (Tr. 392-93.) The VE answered that an individual with such limitations would be precluded from all work. (Tr. 393.)  Finally, the VE testified than an individual with "extremely low readings" in auditory immediate memory, visual immediate memory, immediate memory, auditory delayed memory, visual delayed memory, auditory recognition delayed memory, and general and working memory would be precluded from working. (Tr. 393-94.)

### III.  THE ALJ'S FINDINGS

The ALJ issued a partially favorable decision on November 5, 2007 (tr. 15-20), with the following findings:

1.     The claimant met the disability insured status  requirements of the Act on September 12, 2003, the date he stated he became unable to work, and continued to meet them only through June 30, 2005.

2.     The claimant has not engaged in substantial activity since the alleged onset date.

3.     The medical evidence establishes that the claimant has "severe" impairments, including alcohol abuse and an arterial venous malformation, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. However, his stage IV laryngeal/supraglottic squamous cell carcinoma meets a listing as of January 27, 2007.

4.     The subjective complaints are not persuasive for the reasons given above.

5.     The claimant has the residual functional capacity to perform unskilled, light work, absent consideration of alcohol abuse.  His psychological limitations related to alcohol abuse are set out above.

6.     The claimant is unable to perform his past relevant work.

-18-

7.  The claimant was 49 years old at the alleged onset date, which is defined as a younger individual. Currently, he is 53 years of age, or closely approaching advanced age.

8.  The claimant has at least a seventh grade education.

9.  The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work.

10. Not considering alcohol abuse, and based on an exertional capacity for light, unskilled work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rules 202.18 and 202.11, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11. Considering the limitations caused by alcohol abuse, which is material to the finding of disability prior to January 27, 2007, the claimant's additional non-exertional limitations would not allow him to perform the full range of light work, and using the above-cited rules as a framework for decision-making and based on the vocational expert's testimony, there were not a significant number of jobs in the national economy which he could have performed.

12. The claimant was not under a "disability," as defined in the Social Security Act, through the date he was last insured under Title II, June 30, 2005, and was not disabled prior to January 27, 2007, under Title XVI.

(Tr. 19-20.)


# IV.  DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his

Case 3:08-cv-00687   Document 19   Filed 10/06/10   Page 19 of 31 PageID #: 89

conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)).  The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination.  42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory

-20-

diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he

seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc.*

*Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity

is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v.*

*Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe

impairment" is one which "significantly limits . . . physical or mental ability to do basic work

activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities

and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking;

[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding

appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in

a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the

combined effects of impairments that individually are not severe but cumulatively may constitute

a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve

months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled

without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R.

§§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed

impairment, and that the impairment has lasted or is expected to last for at least twelve months or

-21-

result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past

relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[16] *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B.  The Five-Step Inquiry

The ALJ made two separate findings in resolving the plaintiff's claim. (Tr. 19-20.)  First, the ALJ awarded the plaintiff SSI benefits after determining that his stage IV laryngeal/supraglottic squamous cell carcinoma met a listing as of January 27, 2007. (Tr. 19.)  Second, the ALJ denied the plaintiff DIB for the period of September 12, 2003, through his date last insured on June 30, 2005. (Tr. 20.)

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since September 12, 2003, the alleged onset date. (Tr. 19.)  At step two, the ALJ concluded that the medical evidence established severe impairments of alcohol abuse and AVM. *Id.*  At step three, the ALJ determined that the plaintiff's AVM and alcohol abuse impairments did not meet or medically

_____

[16] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

-23-

equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff could not perform his past work. *Id.* At step five, the ALJ concluded that, not considering the plaintiff's alcohol abuse, he had the RFC to perform light, unskilled work. (Tr. 20.)

### C. Plaintiff's Assertions of Error

The plaintiff raises five claims of error, contending that the ALJ erred in finding that he did not suffer from a severe mental impairment, in determining that his alcoholism was material to the determination of disability, in evaluating the medical opinion evidence of his mental impairments, in concluding that the VE's determination that he could perform jobs was supported by substantial evidence, in failing to properly evaluate his credibility and the medical opinion evidence of Dr. Blazina, and in evaluating his RFC. Docket Entry No. 16, at 14-20. Although the plaintiff raises multiple allegations of error, the pivotal issue is whether the ALJ properly evaluated the materiality of his alcohol abuse in compliance with 20 C.F.R. § 404.1535.

In 1996, the Social Security Act was amended to provide that "[a]n individual shall not be considered disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The Commissioner implemented this standard by enacting 20 C.F.R. §§ 404.1535 and 416.935, which "clearly" require that the five step sequential evaluation process, found in 20 C.F.R. § 404.1520, be followed in the adjudication of disability "before any consideration is given to whether drug addiction [or alcohol abuse] is the cause of such disability." *Williams v. Barnhart*, 338 F. Supp. 2d 849, 862 (M.D. Tenn. 2004) (Wiseman, J.)

-24-

(adopting Report and Recommendation) (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir. 2001)).  *See also Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003); *Wilby v. Astrue*, 2010 WL 2802713, at *9 (N.D. Ohio May 20, 2010); *Goins v. Astrue*, 2010 WL 55687, at *5 (N.D. Ohio Jan. 4, 2010).   Thus, "[t]o find that drug addiction is a contributing factor material to the determination of disability without first finding the [plaintiff] disabled . . . is to put the cart before the horse." *Williams*, 338 F. Supp. 2d at 862.

If the five step sequential evaluation process, without removing the effects of substance abuse disorders from consideration, indicates that the plaintiff is not disabled then there is no need to continue with the substance abuse materiality analysis of 20 C.F.R. §§ 404.1535 and 416.935.  *Brueggemann*, 348 F.3d at 694-95 ("If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent.").  *See also Fastner v. Barnhart*, 324 F.3d 981, 986 (8th Cir. 2003); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Wilby,* 2010 WL 2802713 at *9; *Schopplein v. Astrue*, 2008 WL 4568798, at *12 (E.D. Ky. October 14, 2008); *Williams*, 338 F. Supp. 2d at 863.  Once the gross total of the plaintiff's exertional and non-exertional limitations, including the effects of his substance abuse, reveal that the plaintiff is disabled the adjudicator must determine whether his substance abuse is a "contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a).

The key factor in determining whether the plaintiff's substance abuse is a contributing factor material to his disability is whether he would still be disabled if he stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).  To make that determination, the ALJ must "evaluate

-25-

which of [the plaintiff's] current physical and mental limitations, upon which [he] based [his] current

disability determination, would remain if [the plaintiff] stopped using drugs or alcohol and then

determine whether any or all of [the plaintiff's] remaining limitations would be disabling." 20 C.F.R.

§§ 404.1535(b)(2), 416.935(b)(2)(i)-(ii). If the plaintiff's remaining limitations are not disabling,

then his substance abuse is a "contributing material factor to the determination of disability," but if

the remaining limitations are disabling, then his substance abuse is not a "contributing material

factor to the determination of disability." 20 C.F.R. §§ 404.1535(b)(2)(i)-(ii), 416.935(b)(2)(i)-(ii).

Here, the ALJ found that

[t]he [plaintiff] has no history of mental health treatment except related to alcohol abuse. There is no evidence of depression in the treatment notes of any treating source. Any depression is related to his long history of alcohol abuse, which is material to the finding of disability. Limitations, considering alcohol abuse, include moderate limitations in understanding and remembering, social interaction, and adaptation, with moderate to severe limitations in sustaining concentration and persistence ("B" criteria include moderate limitations in activities of daily living, social interaction, marked limitations in concentration, persistence, or pace, and no episodes of decompensation). The vocational expert testified that with those limitations, the [plaintiff] could not [. . .] perform other work existing in significant numbers in the economy. However, without considering alcohol abuse, the [plaintiff] was limited only to unskilled, light work prior to January 27, 2007.

(Tr. 18.) While it is clear that the ALJ ultimately concluded that the plaintiff's alcohol abuse

materially contributed to his mental impairments, it is unclear how the ALJ arrived at that

determination. The ALJ noted that the VE determined that the plaintiff's limitations, including

alcohol abuse, precluded the plaintiff from working, and thus, the Court assumes that the ALJ

adopted the VE's conclusion and initially found the plaintiff to be disabled. *Id.*

Since the ALJ found that the gross total of the plaintiff's limitations indicated that he was

disabled, the ALJ was free to consider whether the plaintiff's alcohol abuse materially contributed

to the plaintiff's disability. 20 C.F.R. §§ 404.1535(a), 416.935(a). The ALJ concluded that "without

-26-

considering [the plaintiff's] alcohol abuse," he could perform "unskilled, light work." (Tr. 18.) However, the ALJ provided no rationale for concluding that the plaintiff's alcohol abuse materially contributed to his impairments and only noted that his depression was affected by his alcohol abuse, while failing to discuss its affect on his cognitive disorder. (Tr. 18.)

Three different physicians evaluated the plaintiff for mental impairments and diagnosed him with a depressive disorder, a cognitive disorder (tr. 247-48, 264, 266, 277, 286), and a substance abuse disorder attributed to alcohol. (Tr. 247, 271, 276, 286.) Although each physician noted that the plaintiff either had abused or was abusing alcohol, they did not discuss what effect that abuse had on his mental impairments or attributed those impairments to his alcohol abuse. *Id.* Undoubtedly, the evaluating physicians' lack of a concrete finding regarding the effect of the plaintiff's alcohol abuse put the ALJ in an unenviable position of trying to make that determination, *see Vester v. Barnhart*, 416 F.3d 886, 893-94 (8th Cir. 2005) (Haney, J. dissenting) (difficulty in part a result of the fact that the medical reports did not address whether the plaintiff "would remain disabled if she stopped using alcohol"), but the ALJ must still specify which of the plaintiff's impairments are affected by his alcohol abuse and to what degree, and that conclusion must be supported by substantial evidence in the record. 20 C.F.R. §§ 404.1535(b), 416.935(b). *See also Vester*, 416 F.3d at 889 (plaintiff's medical history showed alcohol as a substantial barrier to normal functioning); *Zarlengo v. Barnhart*, 96 Fed. Appx. 987, 990 (6th Cir. 2004) (substantial evidence in the record supported the ALJ's conclusion that when the plaintiff was sober, her physical limitations did not preclude her from working since several physicians directly linked her alcohol abuse to her limitations); *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (reports demonstrated that the plaintiff was able to conduct daily activities and perform certain jobs with reduced alcohol

-27-

intake); *Eltayyeb v. Barnhart*, 2003 WL 22888801, at *5 (S.D.N.Y. Dec. 8, 2003) (psychological evaluations showed that the plaintiff's therapists and mental health evaluators believed that the plaintiff's depression stemmed from substance abuse and that his symptoms would subside absent substance abuse).

Here, the ALJ noted that the VE considered all of the plaintiff's limitations in both of Dr. Blazina's mental evaluations, including his alcohol abuse, and testified that the plaintiff would be precluded from working. (Tr. 18.) The ALJ then found that, if the plaintiff's alcohol abuse were not taken into account, he had the RFC to perform "unskilled light work." *Id.* Although the ALJ's ultimate determination was that the plaintiff's alcohol abuse did materially contribute to his mental impairments, the ALJ erred by failing to explain how his alcohol abuse affected his depression and cognitive disorder. (Tr. 18-20.). *See Parton v. Commissioner*, 2008 WL 4657086, at *12-13 (S.D. Ohio Oct. 21, 2008) ("According to the governing regulations, the ALJ's determination that drug abuse is a contributing factor material to a finding of disability can only be made after a finding of what limitations remain in the absence of drug abuse and whether or not those limitations are sufficient to support a finding of disability.").

The Commissioner argues that the ALJ's determination is supported by substantial evidence in the record, such as the plaintiff's "long standing history of alcohol abuse;" the diagnoses of alcohol abuse by Dr. Edwards, Dr. Williams, and Dr. Blazina; and Dr. Edwards' statement that his continued alcohol abuse was "a factor to his limitations." Docket Entry No. 17, at 10-12. As previously discussed, while it is true that Dr. Blazina, Dr. Edwards, and Dr. Williams all examined the plaintiff for mental limitations and noted his alcohol abuse, they did not establish a causal connection between his alcohol abuse and his mental impairments or indicate what type of effect that

-28-

abuse had on his mental impairments. (Tr. 247, 271, 276, 286.). *Cf. Eltayyeb*, 2003 WL 22888801 at *6 (a causal connection between the plaintiff's symptoms and his substance abuse was established after evidence in the record indicated that he "began drinking the same year he became overtly depressed" and that "his substance abuse did not decrease over time"). Dr. Edwards' PRTF, offered by the Commissioner as support for the ALJ's materiality determination, is less than a model of clarity. While Dr. Edwards noted that the plaintiff's alcohol abuse was a "factor," he did not provide any explanation of how or the extent to which it was "a factor." (Tr. 276.) In addition, Dr. Edwards also noted "substance abuse is not material." (Tr. 277.) While Dr. Edwards may have intended to equate "substance abuse" with "drug addiction," as distinguished from "alcoholism" or alcohol abuse, he did not make that distinction clear, leaving his report apparently inconsistent or at least difficult to understand or reconcile.

Further, despite the plaintiff's history of alcohol abuse, he testified that he worked a full time job for 18 years, never had difficulty working due to his alcohol consumption, and does not "drink very much now." (Tr. 382-83.) There is also no evidence in the record indicating that the plaintiff's mental limitations improved once he reduced the amount of alcohol he regularly consumed. (Tr. 384-86). *Cf. Talley v. Barnhart*, 113 Fed. Appx. 185, 187 (8th Cir. 2004) (substantial evidence supported ALJ's determination of materiality when the medical evidence showed that the plaintiff's most serious problems improved with detoxification and drinking cessation); and *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001) (noting medical expert testimony that, when sober, the plaintiff appeared entirely normal and that he testified that he was able to perform normal daily activities). The record does show, however, that three different doctors diagnosed the plaintiff with depression and a cognitive disorder (tr. 247-48, 264, 266, 277, 286), and that the VE concluded,

-29-

based on two psychological evaluations completed by the same psychologist nine months apart, that the plaintiff would be precluded from working. (Tr. 389-90.)

> An internal memorandum from the Social Security Administration provides that
>
> [w]e know of no research data upon which to reliably predict the expected improvement in a coexisting mental, impairment(s) should drug/alcohol use stop. The most useful evidence that might be obtained in such cases is that relating to a period when the individual was not using drugs/alcohol. . . .  When it is not possible to separate the mental restrictions and limitations imposed by DAA [drug and alcohol abuse] and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate.

Social Security Administration Emergency Teletype No. EM-96200, at Answer 29 (Aug. 30, 1996), https://secure.ssa.gov/apps10/public/reference.nsf/links/04292003041931PM (cited in *Mathious v. Barnhart*, 490 F. Supp.2d 833, 849 (E.D. Mich. 2007)).  Although the ALJ concluded that the plaintiff's alcohol abuse did materially contribute to his depression, he provided no explanation as to how he arrived at that conclusion and did not specify whether it affected the plaintiff's cognitive disorder as required by 20 C.F.R. §§ 404.1535(b) and 416.935(b). (Tr. 18-20.)  Compounding the ALJ's lack of an explanation of what medical evidence upon which he relied is that none of the plaintiff's psychological evaluations causally linked his impairments to his alcohol abuse.  As such, this case should be remanded for a medical examiner to conduct a psychological evaluation on the plaintiff to determine the effect of the plaintiff's alcohol abuse on his mental impairments, for the ALJ to make a RFC finding in accordance with that evaluation, and for the ALJ to specifically address all of the plaintiff's mental impairments that are materially affected by his alcohol abuse and provide support for those explanations.  If the ALJ is not able to distinguish the effects of the plaintiff's alcohol abuse from his mental impairments by looking at the record medical evidence,

-30-

then the "tie goes to [the plaintiff]" and his claim for DIB should be granted. *Brueggemann*, 348 F.3d at 693.

## VI. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 14) be GRANTED to the extent that the case should be REMANDED for the ALJ to have a medical examiner conduct a psychological evaluation on the plaintiff to determine the effect of the plaintiff's alcohol abuse on his mental impairments, for the ALJ to make an RFC determination consistent with that evaluation and the record medical evidence, and for the ALJ to specifically address all of the plaintiff's mental impairments that are materially affected by his alcohol abuse and provide support for those explanations.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

-31-